**BORG–WARNER CORPORATION v. UNITED STATES.**

No. 45220.

United States Court of Claims.

May 1, 1950.

Lee I. Park, Washington, D. C., for plaintiff. Hamel, Park & Saunders, Washington, D. C., were on the brief.

T. Hayward Brown, Washington, D. C., with whom was Acting Assistant Attorney General Newell A. Clapp, for defendant.

Before JONES, Chief Judge and WHITAKER, HOWELL, MADDEN and LITTLETON, Judges.

WHITAKER, Judge.

On August 4, 1939, the President approved Private Law 126, 76th Congress, 1st Session, 53 Stat. 1491, c. 428, which conferred jurisdiction on this court "to hear, determine, and render judgment in such amount as it deems may be equitably due, notwithstanding the lapse of time, or any statute of limitations, or any limitation upon the jurisdiction of such court with respect to claims upon any contract implied in law, upon the claim of the Borg-Warner Corporation, in its own right and as successor to the Marvel Carbureter Company (formerly a wholly owned subsidiary of the Borg-Warner Corporation), against the United States in connection with the development of fuel-injection systems for use on military aircraft: *Provided, however,* That such damages shall not exceed the actual moneys expended by the said Borg-Warner Corporation and the Marvel Carbureter Company in connection with this said development during the calendar years 1927 to 1936, inclusive."

The difference between this Act and other Acts conferring jurisdiction on this

court in exceptional cases is that it gives us jurisdiction to render judgment on any contract "implied in law" between plaintiff and defendant. This is the issue: Was there a contract implied in law?

A man by the name of Milford G. Chandler had secured a patent on a "fluid-distributing mechanism." This mechanism was designed to eliminate carbureters on gas engines and to inject the fluid directly into the cylinders of the engines. Chandler entered into an arrangement with the Marvel Carbureter Company to further develop this invention. The company employed Chandler to carry on further experimental work, for which he was paid a certain salary, the Marvel Carbureter Company paying other expenses.

The company terminated the contract after less than a year. After it had terminated it, it wrote the Air Corps at Mc-Cook Field suggesting that it enter into some sort of arrangement with Chandler for the further development of this invention.

Chandler was given a copy of this letter. He went to see the Air Corps representatives in an effort to induce them to employ him to carry on further development work. The Air Corps, however, was unwilling to do this; it told Chandler that it was interested only in developing sources of supply for such devices, and suggested to him that he undertake to induce the Marvel Carbureter Company to resume its effort to perfect the device, with his help.

Upon receipt of this information the Marvel Carbureter Company reemployed Chandler, and development work was resumed. About a month later the Air Corps purchased one of these devices from the Marvel Carbureter Company, and, after making certain tests of it, suggested certain improvements to the Marvel Company. In the following years, from 1927 through 1936, the Marvel Carbureter Company worked on the perfection of the device with the aid and encouragement and co-operation of the Air Corps, and during this time it furnished the Air Corps and the United States Navy with fuel injectors and parts receiving therefor a total of $248,736.78. These were used by these Services for experimentation.

No purchases were made by the Air Corps or the Navy after 1936. This was because the manufacturers of carbureters had in the meantime eliminated the defect in them which had made them undesireable for use on airplanes. These defects having been eliminated the Air Corps preferred them to plaintiff's fuel-injector system.

In the development of this device through these years the Marvel Carbureter Company expended a sum said to be largely in excess of the amount received from the Air Corps and the Navy. It is for this excess that they sue. Plaintiff says that the dealings between the parties with reference to the development of this device give rise to an obligation implied in law to pay them this excess.

Certainly there was no contract between the Air Corps and the Marvel Carbureter Company to pay for these development expenses which can be implied in fact. The Air Corps expressly refused to employ Chandler and to pay the expenses of the development of this invention, but, on the contrary, in an effort to establish a source of supply from which it might purchase the device, it suggested to the Marvel Carbureter Company that it reemploy Chandler to carry on development. The Marvel Carbureter Company agreed to do this, in the hope that it would be able to sell to the Air Corps, and to others, no doubt, a sufficient amount of these devices to reimburse it for its expenditures and to realize a profit.

However, there was no representation by the Air Corps that it would reimburse the Marvel Company for its loss in case it did not sell enough of the devices to cover the cost of development. There was no fraud practiced, there was no misrepresentation, there was no mistake; nothing was done from which the Marvel Company had any right to conclude that the Air Corps would reimburse it for any loss it might incur.

It is true that after Chandler had been reemployed the Air Corps continued to

press the Marvel Company to proceed with the development of the device as rapidly as it was possible for them to do so, but there was never an intimation that it would guarantee the company against loss.

It is also true that the Air Corps designated all documents, technical data, reports, and devices pertaining to its development as "secret," which under the Espionage Act, 40 Stat. 217, prohibited the sale and manufacture of these articles abroad or the release of any information which would enable others to manufacture it. The secret designation of the documents was first made on March 21, 1931, and the Air Corps continued to insist on the secret nature of these documents and data, with minor exceptions, until 1936, when it released it from its secret classification and permitted unrestricted sale thereof.

This secret designation of the device and documents and data pertaining thereto, of course, deprived the Marvel Carbureter Company of a market which it might otherwise have had, but the designation was done in the exercise of the sovereign power of the Government authorized by the Espionage Act, and for this the Government, of course, incurred no liability. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736; Gothwaite v. United States, 102 Ct.Cl. 400; Standard Accident Insurance Co. v. United States, 59 F.Supp. 407, 103 Ct.Cl. 607; certiorari denied 326 U.S. 729, 66 S.Ct. 37, 90 L.Ed. 434; Clemmer Construction Co. v. United States, 71 F.Supp. 917, 108 Ct.Cl. 718.

The law, instead of creating an obligation to pay for losses occasioned by such an act, expressly absolves the sovereign from such liability. No contract implied in law can arise from the designation of this device, documents and data as secret. It is also true that notwithstanding this "secret" classification, which was on March 21, 1931, the Marvel Carbureter Company continued to incur expense in the development of this device.

Plaintiff says that there arose a contract implied in law because the defendant was unjustly enriched, but the facts do not make out a case of unjust enrichment. The Government purchased from plaintiff or its predecessor about a quarter of a million dollars worth of these devices, and no doubt would have made further purchases, except for the fact that the trouble with carbureters for gas engines had been eliminated, making the fuel-injector device no longer desirable. This was a risk that plaintiff ran and which it must have known it was running when it made its expenditures for the development of the device.

In the absence of any promise, expressed or implied, on the part of the Government to pay plaintiff its losses, or of fraud, misrepresentation or mistake, or the like, no contract implied in law can arise. The Government certainly did not expressly or impliedly promise to continue to purchase these devices if a better one became available, nor did it delude plaintiff into believing it would. We are unable to see how it can be said the Government was unjustly enriched when it purchased and paid for all these devices it could use, and only discontinued these purchases when an improved product became available.

Plaintiff also complains that in 1934 the defendant called for competitive bidding on engines supplied with a fuel-injector device. This, however, is no cause for complaint, because plaintiff knew other companies were working on the device, and there was no agreement on defendant's part that it would purchase only plaintiff's device even if a better one had been developed by someone else.

Plaintiff, in a further effort to show the defendant was unjustly enriched, says that the Air Corps used a fuel-injection system on its B–29 airplanes during World War II and that these systems were manufactured and supplied in accordance with the performance specifications resulting from the Marvel-Chandler development work. This may be true, but it is not alleged that the system used infringed plaintiff's patents. Other manufacturers may have profited from some of the development work done by the Marvel Company and as a result may have been able to develop these systems beyond the point to which the Marvel Company had been able to develop them, but the use of the improved device by the Government does not

render it liable, in the absence of patent infringement, which is not alleged. No claim for an infringement of the Chandler patent having been made, we are unable to see how any liability arises by reason of the fact that some noninfringing device was used on these airplanes.

We are of opinion that no contract implied in fact or in law arose as a result of the dealings between the parties with reference to the development of this invention.

Plaintiff's petition will be dismissed.

HOWELL, MADDEN, and LITTLETON, JJ., and JONES, C. J., concur.